## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

IN RE:   JONATHAN E. WHITEHEAD          CASE NO.: 4:11-bk-13142
                                                                              CHAPTER 7

DENNIS D. BAILEY                                                      PLAINTIFF

v.                                          AP NO. 4:11-ap-01206

JONATHAN E. WHITEHEAD                                       DEFENDANT

### MEMORANDUM OPINION

Now before the Court is the *Complaint Objecting to Discharge and/or Dischargeability of Debt* ("**Complaint**") filed by the Plaintiff, Dennis Bailey, on August 10, 2011. The Defendant, Jonathan E. Whitehead, who is also the Debtor in the above-styled bankruptcy case, filed his *Answer to Complaint* ("**Answer**") on September 9, 2011. On July 12, 2012, this matter came before the Court for trial. Frederick S. Wetzel appeared for the Plaintiff ("**Bailey**"), who was also present. Christian W. Frank appeared for the Defendant ("**Debtor**"), who was also present.

In the Complaint, Bailey seeks an order denying the Debtor's discharge based on a failure to satisfactorily explain the loss of an asset, pursuant to 11 U.S.C. § 727(a)(5).[1] In

---

[1]   Bailey also requested the Court deny the Debtor's discharge based on a failure to keep or preserve adequate records, pursuant to 11 U.S.C. § 727(a)(3). In the alternative, Bailey requested that the Court find the debt the Debtor owed Bailey non-dischargeable, pursuant to § 523(a)(2) or § 523(a)(4). Because the Court denies the Debtor's discharge under § 727(a)(5), it makes no final determination regarding Bailey's other claims.

summary, Bailey contends that the Debtor sold a house – a house that Bailey paid for – to his parents, at a reduced price, and deposited the proceeds from that sale into a checking account – a checking account owned and used collectively by the Debtor and his parents. Bailey claims that the Debtor has failed to explain what happened to the proceeds from that sale. The Debtor asserts that he spent the funds on his personal expenses during the two years between receiving the funds and filing for bankruptcy.

Although the Court believes that the basic premise of the Debtor's proposed explanation – that he spent the money – was plausible, the Debtor failed to provide evidence to support that explanation. The Debtor's testimony was not credible, and the documents in the record do not support the Debtor's proposed explanation. For that reason, and as further explained below, the Court finds that the Debtor failed to satisfactorily explain what happened to the proceeds from the sale, and therefore, pursuant to the requirements of § 727(a)(5), the Debtor is not entitled to receive a discharge.

2

## FACTS[2]

Bailey owns various business ventures including convenience stores, mini-storage buildings, payday lending services, and liquor stores; he is also the Debtor's cousin by marriage. The Debtor is a real property appraiser. He testified that he started working for his father's appraisal business in 2001. In 2009, he obtained his own certified appraisal license and took over the appraisal business.

Bailey and the Debtor had a verbal partnership agreement. Under their partnership agreement, the Debtor was to buy a house, oversee the renovation of that house, and then sell it (hopefully for a profit). Bailey was to supply the funds to purchase and renovate the house. Once the house sold, the parties were to split the net profits evenly. That is, Bailey would receive full reimbursement for any financial advances he made, and the partners would split anything in excess of that amount.

On September 29, 2006, the partners purchased a house at 200 W. 51st St., North Little

---

[2] The Court notes that the Debtor made assertions throughout the trial concerning the nature of Bailey's character and business practices. Of particular resonance with the Court was the Debtor's assertion that Bailey transferred property for the purpose of avoiding collection by his creditors. These assertions were well taken, and in assessing the validity of Bailey's claims under § 523, the Court determined that Bailey's claims were barred by the equitable doctrine of unclean hands. However, unclean hands is not a defense to a claim made pursuant to § 727. *See In re Monus*, 167 Fed. Appx. 494, 496 (6th Cir. 2006) ("[T]he equitable doctrine of unclean hands is not applicable in proceedings seeking to bar a debtor from receiving a general discharge under § 727(a), . . . unlike an inquiry under a dischargeability proceeding under § 523, which seeks to vindicate only a single creditor's debt, the inquiry in a proceeding under § 727(a) is directed toward protecting the integrity of the bankruptcy system by denying discharge to debtors who engage in objectionable conduct that is of a magnitude and effect broader and more pervasive than a fraud on a single creditor."). Because the Court decides this case under § 727, the majority of those assertions are not discussed in this Memorandum Opinion.

Rock, Arkansas, for $43,800 (the "**Investment Property**").  As agreed, Bailey paid the entire purchase price of the Investment Property.  The property was titled in the name of both Bailey and the Debtor.  Over a period of two years following the purchase of the Investment Property, Bailey made several financial advances to the Debtor (in the amounts of $4,085, $3,600, $1,020, $2,000, $2,900) for the renovation of the Investment Property.  On July 26, 2008, Bailey advanced $22,000 to the Debtor for the purchase of a second house (the "**Second Investment Property**").  In total, Bailey claims he advanced $79,405 toward the investments of the partnership, and was owed that entire amount before the partners would split any money earned by the partnership.

The Second Investment Property was never actually purchased.  According to the Debtor, the parties were to purchase the Second Investment Property through a third party named Josh Warlord.  The Debtor testified that he gave Warlord approximately $13,500 in cash to purchase the Second Investment Property, but that Warlord never purchased the property nor returned the money.  The Debtor testified that he used the rest of the $22,000 advance to pay personal expenses, and to make private loans in an attempt to earn back the $13,500 lost to Warlord.[3]

As the partners' dealings with the Investment Property progressed, so did a lawsuit against Bailey.  In 2006, the Arkansas State Board of Collection Agencies ("**ASBCA**") sued Bailey with regard to his payday lending businesses, Case No. CV-2006-7387 (the "**ASBCA**

---

[3] The Debtor provided no further testimony or documentation to explain what happened to the $22,000 advance.

**Lawsuit**").  Although Bailey ultimately resolved the ASBCA Lawsuit through a settlement agreement, the terms of which were not disclosed in this Court, several actions connected to the ASBCA Lawsuit are important to this case.

While the ASBCA Lawsuit was pending, the parties agreed to transfer the Investment Property solely into the name of the Debtor.  They agreed to transfer the property in order to prevent the ASBCA from attaching a lien to the Investment Property.[4]  The transfer did not otherwise change the parties' agreement.

On May 1, 2007, after Bailey removed his name from the Investment Property, the ASBCA obtained a $1,317,450 judgment against him.  To collect on that judgment, the ASBCA named the Debtor as a co-defendant in a separate lawsuit, Case No. CV-2007-6073,[5] and placed a *lis pendens*[6] on the Investment Property.  The Debtor ultimately reached a settlement agreement with the ASBCA under which, in an exchange for a payment of $8,000, the ASBCA dismissed the Debtor from the lawsuit and released the *lis pendens* on the Investment Property.

---

[4]  Although the parties dispute who initially proposed the idea of the transfer, they did not dispute that the purpose of the transfer was to prevent the ASBCA from attaching a lien to the property.

[5]  For the purpose of simplifying the record, the Court refers to both actions by the ASBCA collectively as the ASBCA Lawsuit.

[6]  "A notice of *lis pendens* is a well-established, traditional remedy whereby a plaintiff (usually a judgment creditor) who brings an action to enforce an interest in property to which the Debtor has title gives notice of the pendency of such action to third parties; the notice causes the interest which he establishes, if successful, to relate back to the date of the filing of the *lis pendens*."  *Connecticut v. Doehr,* 501 U.S. 1, 29, 111 S.Ct. 2105, 2122, 115 L.Ed.2d 1 (1991).

5

On March 25, 2009, the Debtor sold the Investment Property to his parents. According to the closing statement from that transaction, the purchase price of the property was $75,000. As part of that transaction, the Debtor gave his parents an "equity gift," which reduced the amount his parents were required to pay for the house by $15,000. After reducing the purchase price by the amount of the equity gift, and by the amount of the closing fees and costs, the Debtor was to receive $53,080.80 from the sale of the Investment Property. That amount was further reduced by an $8,000 payment to the ASBCA in compliance with the terms of the Debtor's settlement agreement in the ASBCA Lawsuit.[7] Taking all of these reductions into account, the Debtor received a net amount of $45,080.80 from the sale of the Investment Property (the "**Proceeds**").

The Debtor never told Bailey that he sold the Investment Property, and never paid him any portion of the Proceeds. Bailey had advanced $79,405 to the partnership under an agreement that he would receive full reimbursement of those advanced funds before the partners would split any money. When the Debtor sold the Investment Property, and received a check for $45,080.80, he gave Bailey nothing. When questioned about why he did not pay the Proceeds to Bailey, the Debtor testified that being involved in the ASBCA Lawsuit damaged his appraisal business, and that he was entitled to keep the Proceeds to offset that loss. The Debtor also testified that he kept the money because he was worried about his personal safety. Lastly, the Debtor testified that he kept the Proceeds as

---

[7] Having received this payment, the ASBCA dismissed the Debtor from the lawsuit on April 8, 2009.

compensation for work he performed at a liquor store owned by Bailey.  As part of this explanation, the Debtor testified that he worked at the liquor store for well over a year and a half, twelve hours a day, six days a week.  The Debtor testified that the entire time he was working at the liquor store, Bailey was supposed to pay him $10 an hour, and that the only compensation he received was one $625 payment.

Five days after the sale of the Investment Property, on March 30, 2009, the Debtor deposited $44,330.80 of the Proceeds into a checking account.[8]  That checking account was owned by three people:  the Debtor, his mother, and his father.  All three owners deposited income into the checking account, and all three owners used the funds in the account to pay their personal expenses.  Specifically, the Debtor testified that his parents' retirement income, his parents' employment income, and the income from his appraisal business were all deposited into the checking account.  He also testified that he paid the bills and expenses for all three parties out of the checking account.

The Debtor provided bank statements for the checking account spanning from the month of the deposit, March of 2009, through April of 2011.  For purposes of the subsequent analysis in this Memorandum Opinion, the Court specifically describes several of the transactions referenced on those bank statements.  On March 30, 2009, the day the Debtor deposited the Proceeds into the checking account, the bank statement shows a deduction of

---

[8]  The Debtor provided no testimony or documentation to explain the $750 difference between the Proceeds he received at the closing of the sale – $45,080.80 – and the amount he deposited into the checking account – $44,330.80.

$35,772.94 from the checking account.  The bank statement refers to that deduction as a "withdrawal."  The Debtor testified that this transaction was a transfer of the Proceeds to a savings account.  When asked on cross-examination what happened to the $35,772.94 after the transfer to the savings account, the Debtor testified that the money was transferred back into the checking account.  However, the Debtor did not provide any documentation regarding the savings account, and did not provide any further explanation as to when, or in what amounts, the funds were transferred back into the checking account.  Immediately below the $35,772.94 transaction, and also dated March 30, 2009, the bank statement shows another "withdrawal" of $2,000.  Two days later, on April 2, 2009, the bank statement shows a deduction of $321.21.  The bank statement refers to that transaction as a "Withdrawal Transfer to [Account Number]."[9]  Throughout the two years of checking account statements, there are numerous other transfers to that bank account, as well as to other bank accounts, each of which is referenced as a "Withdrawal Transfer to [Account Number]."  The Debtor did not provide any documentation or testimony regarding the transfers to other bank accounts.

The Debtor testified that all the Proceeds were spent prior to filing bankruptcy.  As support for this explanation, the Debtor relied on a comparison of his income for 2009 and 2010, against his expenses for those years.  The Debtor showed his income for those years through his 2009 and 2010 income tax returns, which show a net income of $10,864 in 2009,

---

[9]  The bank statement includes the full account number.  The Court has excluded the account numbers for the protection of the owners of those accounts.

8

and $13,563 in 2010.  To show his expenses for that period of time, the Debtor estimated his monthly expenses using the figures on Schedule J of his bankruptcy filing, which showed regular ongoing personal expenses of approximately $2,000 per month.[10]  By comparing the two amounts, the Debtor estimated that of the $45,080.80 he received from the sale of the Investment Property, he used approximately $24,500 to pay his personal expenses in 2009 and 2010.  The Debtor also testified that he used $8,000 to pay off a personal loan with Peoples Bank, and $4,510 to purchase a vehicle from Just Chevrolet, and he identified those two transactions on the bank statements for the checking account.[11]  Finally, the Debtor testified that he used any remaining amount of the Proceeds to pay for meals and other personal expenses.

In approximately June of 2009, after Bailey learned through his own investigative that the Debtor had sold the Investment Property, Bailey sued the Debtor in state court to recover the Proceeds (the "**State Court Lawsuit**").  On April 25, 2011, as part of the State Court Lawsuit, Bailey took the Debtor's deposition.  In that deposition, the Debtor made the following statements:

Question: Who put up the $43,000?

Answer: I did mostly.

---

[10]  This estimated figure was reached during the trial through a series of calculations.  In summary, the Debtor's total expenses on Schedule J were $3,523.47.  To reach the $2,000 figure, the Debtor subtracted his estimated business expenses from the combined amount of his estimated expenses.

[11]   The $8,000 check to Peoples Bank was drawn on the account on June 15, 2009, and the $4,510 check to Just Chevrolet was drawn on the account on July 20, 2009.

Question: Mostly?

Answer: Yes. Mr. Bailey had some in it.

. . .

Question: Besides the purchase price, what other money of your own did you put into the project at 200 West 51st St.?

Answer: I've got a list of things.  I have fixed the air conditioner.  I'm in the process of putting a new roof on it or in the process of starting to do that.

Question: Right now?

Answer: Right now.  There were other things such as light fixtures, things of that nature.[12]

. . .

Question: Do you have anything showing that [the fast-cash loan] has been repaid?

Answer: No, I do not.

Question:  Did you not get a receipt?

Answer: No, I did not.

Question: You don't have a cancelled check?

Answer: I worked for Mr. Bailey for well over six months at his liquor store for any unpaid debts as far as these type loans go.

(State Court Lawsuit Deposition, at 14, 27-28, 39).

--------

[12]  The Court notes the timing of this statement.  The Debtor stated that he was "in the process" of putting a new roof on the Investment Property during the deposition in the State Court Lawsuit, which was taken on April 25, 2011, more than two years after the Debtor claims to have sold the Investment Property.

## DISCUSSION

Section 727(a)(5) of the Bankruptcy Code prohibits the Court from granting a discharge if the debtor "has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).  The purpose of § 727(a)(5) is to require the debtor to cooperate with the trustee and creditors in their efforts to trace the disposition of assets of the estate.  *In re Olson*, 98 B.R. 944, 953 (Bankr. D. Minn. 1988).

The burden of proof under § 727(a)(5) is divided into two stages.  First, the objecting party must show that the debtor owned "substantial and identifiable assets" prior to filing bankruptcy, which could have been used to pay creditors.  *In re Cooper*, 399 B.R. 637, 652 (Bankr. E.D. Ark. 2009); *In re Bakker,* 2006 WL 240519, *4 (Bankr. N.D. Iowa 2006) ("A claim under § 727(a)(5) first requires proof that the debtor no longer has an asset he once had.").  Once the creditor provides sufficient proof that the asset existed, the burden  is on the debtor to provide a satisfactory explanation as to how that asset was lost.  *In re Cooper*, 399 B.R. at 652 (quoting *In re Sendecky*, 283 B.R. 760, 766 (B.A.P. 8th Cir. 2002) ("If a party demonstrates a deficiency of assets, the burden shifts to the debtor to explain the loss.")).

"What constitutes a 'satisfactory' explanation is left to the discretion of the Court." *In re Riley*, 305 B.R. 873, 885 (Bankr. W.D. Mo. 2004).  The Court needs proof of what happened to the asset so that it does not have to speculate about what happened to the asset or speculate as to the veracity of the debtor's explanation.  *In re Beshears*, 196 B.R. 468, 473 (Bankr. E.D. Ark. 1996);  *In re Huynh*, 392 B.R. 802, 813 (Bankr. D.N.D. 2008) ("For a debtor's explanation to be satisfactory, it must 'convince the judge that the debtor has not

hidden or improperly shielded assets. . . . General assertions that money was spent on living expenses or lost through gambling, without documentation, are unacceptable.'") (quoting *In re Carter*, 236 B.R. 173, 180-81 (Bankr. E.D. Pa. 1999)). The debtor must explain the disposition of the asset through specific and credible evidence in the form of books, financial records, documents, and testimony. *See In re Drenckhahn*, 77 B.R. 697, 710 (Bankr. D. Minn. 1987). While the debtor's explanation does not have to be "far-reaching and comprehensive," it must be more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions." *In re Olbur*, 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004) (internal quotation omitted); *In re Sendecky*, 283 B.R. at 766 ("If the explanation is too vague, indefinite, or unsatisfactory then the debtor is not entitled to a discharge.").

However, it is important to keep in mind that the sole inquiry under § 727(a)(5) is whether there is a complete and truthful explanation showing that the asset no longer exists. *See In re Riley*, 305 B.R. at 885; *In re Olbur*, 314 B.R. at 741. The Court does not sit in judgment of the debtor's pre-petition actions that resulted in the loss of the asset; instead, the key consideration is whether the debtor has provided a reliable explanation of what happened to the asset. *In re Sharp*, 2008 WL 3539671, *2 (Bankr. E.D. Ark. 2008) ("The Code does not require that the Debtor's explanation be meritorious, or that the loss or other disposition of assets be proper; it only requires that the explanation satisfactorily account for the disposition.") (internal quotations omitted). "To be satisfactory, the explanation must convince the bankruptcy judge that the debtor has not hidden or improperly shielded the assets." *In re Bodenstein*, 168 B.R. 23, 33 (Bankr. E.D.N.Y. 1994).

## ANALYSIS

Bailey contends that the Court should deny the Debtor's discharge under § 727(a)(5) because the Debtor cannot explain what happened to the Proceeds from the sale of the Investment Property.  Specifically, Bailey asserts that the Debtor sold the Investment Property – a house paid for by Bailey and renovated with Bailey's money – to his parents. In that transaction, the Debtor gave an "equity gift" to his parents, which reduced the purchase price of the Investment Property by $15,000.  The Debtor then placed $44,330.80 of the Proceeds from the sale into a checking account that his parents had access to and that was used to pay their expenses.  Bailey asserts that the Debtor failed to explain what happened to those funds.  As further explained below, the Court finds that the Debtor failed to provide a credible explanation for what happened to the Proceeds, and therefore, the Court denies the Debtor's discharge.

To meet his initial burden of proof, Bailey was required to show that the Debtor owned a "substantial and identifiable asset" prior to filing bankruptcy.  There is no doubt that Bailey met this burden.  The Debtor admitted that he sold the Investment Property to his parents, received the Proceeds from his parents, and deposited $44,330.80 of the Proceeds into a checking account he owed and used jointly with his parents.  The Court finds that the Debtor owned a "substantial and identifiable asset" prior to filing, and thus, the burden shifts to the Debtor to provide a satisfactory explanation for the loss of that asset.[13]

---

[13]  The Court notes the reference of other potential "substantial and identifiable assets" in the facts. Specifically, the facts refer to several financial advances Bailey made to the Debtor for

The Debtor's explanation is simple: he says he spent the money. The Debtor explains that in the two years following the sale of the Investment Property, he spent more money than he made, and then used the Proceeds to make up the difference.[14] Despite the Court's laborious efforts to extract a reliable explanation from the record, the Court finds that the Debtor's testimony was not credible, and that the record does not establish a satisfactory explanation for what happened to the Proceeds.

A crucial factor in the Court's evaluation of this case was the Debtor's credibility.[15] The Court's initial concerns about the Debtor's credibility arose from the inconsistencies

_____

the partnership, including the $22,000 advance for the purchase the Second Investment Property. However, those facts were presented in this case for the purpose of showing that Bailey was owed the entire amount of the Proceeds under the terms of the partnership agreement. Bailey did not argue that the Debtor had failed to explain the loss of the advanced funds. Thus, for purposes of § 727(a)(5), the inquiry in this case is limited to the Proceeds.

[14] The Court is aware that the length of time between the debtor's ownership of the asset and the date of filing is a common consideration in an analysis under § 727(a)(5). *See In re Straub,* 192 B.R. 522 (Bankr. D.N.D. 1996). "This makes sense: a debtor should not be deprived of a discharge merely because he can no longer explain (or can explain but cannot document) a loss of assets years before the bankruptcy." *In re Olbur,* 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004). That is, as time passes, the level of detail expected from the debtor's testimony is reduced; the passage of time lends credibility to a debtor's receding memory. In this case, the Debtor received the Proceeds on March 25, 2009, and did not file bankruptcy until May 12, 2011, more than two years later. However, as is discussed below, the Court did not base its determination that the Debtor's testimony was not credible on the Debtor's inability to recollect how he spent the Proceeds, but instead, on his inability to do so in a consistent and reliable manner.

[15] The Court notes that while credibility is almost always an issue in a dischargeability proceeding, the surreptitious circumstances of this case make it a particularly pertinent consideration. To review, the Debtor sold the Investment Property to his parents, in a transaction where he reduced the purchase price through an equity gift to his parents, and then placed the Proceeds from the sale in a checking account he owned with his parents. The Debtor took these actions without informing Bailey – his partner, who paid for the purchase and renovation of the property – about the sale.

14

between the Debtor's statements in the deposition in the State Court Lawsuit and his testimony at this trial.  In the deposition, the Debtor testified that he purchased the Investment Property with mostly his own money.  At the trial, he testified that Bailey paid for the purchase of the Investment Property.  In the deposition, the Debtor claimed to have paid for many of the renovations to the Investment Property.  At the trial, the Debtor's testimony made clear that the renovations were paid for with money advanced to him by Bailey.  In the deposition, the Debtor testified that he worked at Bailey's liquor store for "well over six months," and that he was working there to pay off "unpaid debts" to Bailey. At the trial, the Debtor expanded the time he had worked at the liquor store to a year and a half, and in a context that was clearly intended to convince the Court that Bailey still owed him for that work.

There were also shifts in the Debtor's testimony throughout the trial that diminished his credibility.  For example, throughout the trial, the Debtor gave three very different explanations of why he did not pay any of the Proceeds to Bailey.  Initially, the Debtor claimed that he kept the Proceeds because his interactions with Bailey caused him to be sued by the ASBCA, that the involvement in the ASBCA Lawsuit damaged his business as an appraiser, and that he kept the Proceeds to offset that injury.  Later in his testimony, the Debtor testified that he did not inform Bailey about the Proceeds because he feared Bailey would physically harm him.  Toward the end of his testimony, the Debtor gave the explanation that he kept the Proceeds as compensation for work he performed at Bailey's liquor store, for which he was not compensated.  The Court has tremendous concerns about

15

the validity of these explanations,[16] but that is not the point. The explanations are not harmful to the Debtor's credibility simply because they are far-fetched; the explanations are harmful to the Debtor's credibility because they changed throughout the trial.[17] These marked shifts in the Debtor's explanations show a lack of commitment to the truth, which taints his entire testimony. The Court finds that the Debtor's testimony is not credible.

Given the lack of credibility in the Debtor's testimony, the Court endeavored to obtain an explanation for the loss of the Proceeds from the documents provided at trial. The Debtor introduced three exhibits into the record for the purpose of explaining what happened to the Proceeds: (1) tax returns for the years 2009 and 2010, (2) approximately two years of bank

---

[16] The Court does not find the Debtor's explanations believable. The Debtor's first explanation was that he was owed the money because of his involvement in the ASBCA Lawsuit. The Debtor agreed to participate in a scheme to prevent the ASBCA from attaching a lien to the Investment Property. This leaves little room for the Debtor to complain that he was harmed by being made a defendant in the ASBCA Lawsuit. Furthermore, the Debtor attempted to illustrate the harm he had suffered by testifying that his appraisal business income declined from $70,000 in 2007, to around $10,000 in 2009. But the Debtor is a real estate appraiser, and the years 2007 through 2009 were not good economic times for businesses that rely on real property transactions as a source of income. The Court finds it difficult to accept, without some greater proof, that this decline in income was owed entirely to the Debtor's involvement in the ASBCA Lawsuits. The Debtor's second explanation was that he was concerned about being harmed by Bailey. The Court is utterly perplexed as to how fear of physical harm would motivate the Debtor *not* to pay the Proceeds to Bailey. If the Debtor's concern was that Bailey would harm him if he did not pay, the incentive should have been to pay the Proceeds to Bailey as was required by their partnership agreement. Finally, the Debtor provided an explanation that he kept the Proceeds because he worked twelve hours a day, six days a week, for a year and a half at Bailey's liquor store, all without compensation. The notion that the Debtor worked that long without pay is simply not believable.

[17] The Court considered the possibility that these explanations should be viewed cumulatively. However, at the trial, the Debtor's testimony regarding each explanation was separate and detached from the other, and perceived as a replacement explanation when the validity of a former was called into question.

16

statements from the joint checking account he held with his parents, and (3) the Schedules and Statement of Financial Affairs filed in his bankruptcy case.[18] After thoroughly reviewing these documents, the Court finds that they leave the Debtor's proposed explanation too vague and indefinite to provide the Court with a satisfactory explanation of what happened to the Proceeds.

The Debtor attempted to prove that he spent the Proceeds by making a comparison of his income and expenses for the years after he received the Proceeds. Toward that end, the Debtor relied on the net amount of his income shown on his income tax returns, and the personal expenses he listed on Schedule J of his bankruptcy case. From a comparison of those figures, the Debtor concluded that throughout the two years after he received the Proceeds, he spent approximately $24,500 more than he made. The Debtor contended that he used the Proceeds to cover those expenses. The Debtor attempted to account for the remaining amount of the Proceeds (approximately $20,500) by referring to an $8,000 check he used to pay off a personal loan, and a $4,510 check he used to purchase a vehicle, and by testifying that he spent a lot of money on meals.

---

[18] The Court made every effort to allow evidence of what happened to the Proceeds into the record. For example, the Court entered a Pre-Trial Order on October 21, 2011, stating that the parties were to provide opposing counsel with copies of all trial exhibits at least 14 days prior to trial. At the trial, the Debtor introduced the two years of bank statements from the checking account. The first time that Bailey, or his counsel, saw those bank statements was when the Debtor proffered them at trial. Nonetheless, over Bailey's objection, the Court allowed the documents into the record out of concern that a procedural oversight might prevent the Debtor from receiving a discharge. To offset the prejudice to Bailey of allowing this evidence into the record, the Court took a break to allow Plaintiff's counsel to review the records. The Court also left the record open after the hearing in case Bailey determined that he needed to conduct further cross-examination regarding those documents.

Although the Debtor was not required to provide an exact accounting of how the Proceeds were spent, given the Court's findings regarding the Debtor's credibility, this explanation was too vague to prove that the Debtor spent the Proceeds. The biggest part of the calculation presupposes that the net income from the Debtor's income tax returns constitutes the total pool of funds from which the Debtor pays his expenses. Conversely, the Debtor's testimony indicated that he sometimes used other sources to pay his expenses. For instance, the Debtor testified that he used a part of the money advanced by Bailey for Second Investment Property to pay his personal expenses. Additionally, the expense portion of the calculation was based on estimates taken from the Debtor's bankruptcy schedules, and the only two specific expenses referenced were paid out of the checking account well after the Debtor removed the majority of the Proceeds from that account. Furthermore, the calculation takes the Debtor's meal expenses into account twice: once as part of the Schedule J expense calculation, and again to cover any remaining and unaccounted for portion of the Proceeds. In a different case, where the explanation was based on credible testimony, such a calculation might be sufficient. In this case, however, where the Debtor's testimony failed all tests of reliability, this generalized calculation was not enough, and left the Court without proof that the Debtor spent the money.

The Debtor also provided the Court with two years of bank statements for the checking account starting in March of 2009, and continuing through April of 2011. However, those bank statements raise more questions than they answer. The bank statements show that on March 30, 2009, the Debtor deposited $44,330.80 into the checking account.

18

That same day, the Debtor removed $35,772.94 from the checking account.  The Debtor

testified that this transaction was a transfer of the Proceeds from the checking account to a

savings account.  The Court's review of the bank statements severely called into question the

accuracy of that statement.  The $35,772.94 transaction is described on the checking account

statement as a "withdrawal."  Meanwhile, when the bank statements describe transfers from

the checking account to other bank accounts, those transactions are referred to as a

"Withdrawal Transfer to [Account Number]."  Based on this comparison, it appears that the

$35,772.94 transaction was a withdrawal from the account, as opposed to a transfer to a

savings account.  Of course, the Debtor could have easily resolved this contradiction by

providing the Court with documentation concerning the alleged savings account, but he did

not.  No documents were put in the record to prove that a savings account existed, or that the

Proceeds were transferred to it.[19]

More importantly, even assuming the funds were transferred to a savings account, the

documents in the record do not establish what happened to the Proceeds after that transfer.

The Debtor testified that all of the funds transferred to the savings account were eventually

transferred back into the checking account.  However, the Debtor made no attempt to direct

---

[19]   The same day the Debtor removed the $35,772.94, he also removed an additional
$2,000.  This transaction appears on the bank statement on the line immediately below the
$35,772.94 withdrawal, and is similarly described on the statement as a "withdrawal."  It is
undeniable that the $2,000 was a portion of the Proceeds because the checking account balance
prior to the deposit of the Proceeds was less than $2,000, and there were no deposits into the
checking account between the deposit of the Proceeds and the withdrawal of the $2,000.  Yet,
the Debtor made no attempt to explain what happened to the $2,000 after it was removed from
the account.  Indeed, the Debtor failed to acknowledge the $2,000 transaction in his testimony in
any way.  This lack of explanation further undermines the credibility of the Debtor's testimony.

the Court to any transaction on the checking account statements where those transfers could be found, and did not reference when they occurred, or in what amounts.  Without more information on those transactions, or without at least being provided the account number for the savings account, the Court could not locate those transactions on the bank statements.  The Court attempted to do so, but could reach no conclusion without engaging in pure speculation.  From this, the Court concludes that the bank statements for the checking account prove only three things: (1) the Debtor deposited the Proceeds in the checking account; (2) the Debtor and his parents, who paid the Proceeds, share the checking account; and (3) the Debtor removed the majority of the Proceeds from the checking account the same day as he deposited them.  That is all.

The Debtor did not provide the Court with the bank statements for the alleged savings account.  In fact, the Debtor made repeated references to documents that he *could* provide to prove what happened to the Proceeds.  The Debtor deflected questions throughout the trial by stating that the answers to those questions could be found in his documents.  Yet, when asked whether he had the records for the savings account, he stated that he did not bring them.  This was the trial where those documents were relevant and were needed to support the Debtor's case.  If those documents exist, the Court does not have them, cannot review them, and cannot consider them in making this determination.

The Debtor had a burden to produce reliable evidence in support of his explanation that he spent the Proceeds.  Multiple concerns regarding the Debtor's credibility addressed in this Memorandum Opinion cause the Court to conclude that the Debtor's testimony lacked

the honesty and credibility needed for the Court to rely on it for an explanation of what happened to the Proceeds.  The Court's attempts to obtain that explanation from the documents in the record required the Court to engage in pure speculation, which it cannot do. The Court is left with unreliable testimony and a complete failure of evidence.  Therefore, the Court finds that the Debtor has failed to provide a valid explanation for the loss of the Proceeds, and denies the Debtor's discharge.

## CONCLUSION

Taking into consideration all the evidence provided at the hearing, the Court finds that the Debtor has failed to satisfactorily explain what happened to the Proceeds from the sale of the Investment Property, and therefore, pursuant to 11 U.S.C. § 727(a)(5), the Debtor's discharge is denied.

Audrey R. Evans
United States Bankruptcy Judge
Dated:   10/16/2012

cc:   Frederick S. Wetzel, Attorney for Plaintiff
      Christian W. Frank, Attorney for Debtor/Defendant
      Richard L. Cox, Chapter 7 Trustee
      U.S. Trustee

21